IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| UNIQUE DEVELOPMENT GROUP, LLC, | § § § | |
| Plaintiff, | § § | |
| v. | § § | CIVIL ACTION NO. H-18-4542 |
| NORMANDY CAPITAL TRUST AND COHEN FINANCIAL | § § § § | |
| Defendants. | § | |

## **MEMORANDUM OPINION**

Pending before the court[1] is Defendants Normandy Capital Trust ("Normandy") and Cohen Financial's ("Cohen") Motion to Dismiss (Doc. 26). The court has considered the motion, the response, all other relevant filings, and the applicable law. For the reasons set forth below, the court **DENIES** Defendants' Motion to Dismiss.

### **I. Case Background**

Plaintiff filed this lawsuit alleging fraud and breach of contract against Defendants.

**A. Factual Background**

On July 20, 2017, Plaintiff entered into a commercial promissory note (the "Note") related to nine properties located in Houston, Texas (the "Properties"), with A10 Capital, LLC.[2] The

---

[1] The parties consented to proceed before the undersigned magistrate judge for all proceedings, including trial and final judgment, pursuant to 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73. See Doc. 12, Ord. Dated Dec. 19, 2018.

[2] See Doc. 22-1, Ex. 1 to Pl.'s 1st Am. Compl., The Note pp. 1-2.

Note was secured by a deed of trust (the "Deed of Trust").[3] The Deed of Trust was assigned to Normandy on October 24, 2017.[4] Cohen is the servicer of the Note.[5] The Note matured on August 1, 2018, with a balance due.[6] In August 2018, Plaintiff began negotiations with Toorak Capital ("Toorak"), who was acting on behalf of Normandy, regarding a potential extension and reinstatement of the Note.[7]

On October 10, 2018, Defendants notified Plaintiff of the default and acceleration of the note and provided a notice of trust sale with a sale date of November 6, 2018.[8] On October 16, Darren Weaver ("Weaver"), a Toorak representative, emailed Bill Underwood ("Underwood"), Plaintiff's counsel, inquiring on the status of reinstatement and stating, "figures coming now."[9] Shortly thereafter, Clark Rogers ("Rogers"), an asset manager for Cohen, emailed Underwood stating, "Figures attached. Please reach out to

---

[3] See id.

[4] See Doc. 26-1, Ex. 2 to Defs.' Mot. to Dismiss, Assignment of the Deed of Trust.

[5] See Doc. 22-9, Ex. 9 to Defs.' Mot. to Dismiss, Not. of Substitute Trustee Sale.

[6] See Doc. 22, Pls.' 1st Am. Compl. p. 3.

[7] See id.

[8] See id. p. 4; Doc. 22-9, Ex. 9 to Pl.'s 1st Am. Compl., Notice of Trustee Sale.

[9] See Doc. 22-2, Ex. 2 to Pl.'s 1st Am. Compl., Oct. 16 Emails Between Parties.

2

[Weaver] with any questions or concerns."[10]  Attached to the email was a payoff statement that said, "We have prepared the following figures for the payoff that is to occur on October 31, 2018."[11]  The payoff statement showed a balance of $3,776,255.77 due on the Note and was comprised of the following categories:

| Principal | $ 3,150,000.00 |
|---|---|
| Regular Interest | $ 85,400.00 |
| Default Interest | $ 141,750.00 |
| Document Processing Fee | $ 200.00 |
| Exit Fee | $ 94,500.00 |
| Delinquent Taxes | $ 221,739.53 |
| Late Fee | $ 12,407.50 |
| Revaluation Fee | $ 139.00 |
| Force Placed Insurance | $ 22,035.00 |
| Inspection Fee | $ 3,525.00 |
| Special Servicing Fee | $ 44,559.74 |
| Total | $ 3,776,255.77 |

Handwritten next to the above figures was the notation "$389,866.77[.]"[12]  After Rogers's email, Weaver sent an email in the same chain stating, "DI, Exit Fee, Revaluation fee, are not applicable at this time for reinstatement all others are[.]  The loan is past maturity. Typically there is an extension fee but [we]

---

[10]   See id.

[11]   See Doc. 22-3, Ex. 3 to Pl.'s 1st Am. Compl., Payoff Statement.

[12]   See id.

are flexible here to get this reinstated."[13] When the principal, default interest, exit fee, and revaluation fee are subtracted from the total shown on the payoff statement, the amount left is $389,866.77, which represents the sum of the remaining values.

On October 18, 2018, Underwood emailed Weaver stating that Plaintiff could "pay $100,000 tomorrow and the balance by the end of next week, though hopefully sooner. . . . Can we reach an agreement based upon this?"[14] Weaver responded, stating, "Cohen will confirm receipt of the $100,000 once received today/tomorrow. As discussed, if all the reinstatement funds are received as evidenced in the payoff letter sent yesterday - the loan would be considered in good standing. . . . The sale will remain on the calendar for 11/6 until full reinstatement funds are received."[15] Later the same day, Underwood thanked Weaver and requested a draft of the extension terms, which Weaver agreed to provide soon.[16]

Weaver sent Underwood a draft of the extension terms noting that the draft included a default acknowledgment and a forbearance section which "should be a fair trade off for waiving all the DI for reinstatement."[17] Underwood responded, stating that the

---

[13] See Doc. 22-2, Ex. 2 to Pl.'s 1st Am. Compl., Oct. 16 Emails Between Parties.

[14] See Doc. 22-4, Ex. 4 to Pl.'s 1st Am. Compl., Emails Between Parties p. 10.

[15] See id. pp. 9-10.

[16] See id. p. 8.

[17] See id. p. 6.

4

maturity date on the extension draft appeared incorrect.[18] Weaver agreed that the date on the draft was an error and asked Underwood to propose a new date.[19] Underwood proposed December 15, 2018, and Weaver sent an updated draft.[20] The updated draft of the "Note and Mortgage Extension Agreement" (the "Extension Agreement") included the following: (1) Plaintiff would pay $32,120 in connection with the extension; (2) the statement "Please be advised that this Note & Mortgage Extension Agreement is not valid until all fees are paid[;]" and (3) a clause that stated that Plaintiff's total indebtedness included: "(i) principal of $3,150,000; (ii) default interest, late charges, taxes, insurance, legal fees, revaluation fees, servicer fees, and all other fees that have accrued from August 1st, 2018 . . . ."[21]

On October 18, 2018, at 7:35 p.m., Underwood emailed Weaver confirming that $100,000 was available to transfer to Cohen on October 19, 2018.[22] Underwood also requested that Weaver "confirm that this $100,000 will be credited toward the amount required for reinstatement set forth in the letter of October 16, 2018 from Cohen Financial, and that when the balance for reinstatement is

---

[18]   See id. pp. 4-5.

[19]   See id. p. 4.

[20]   See id. pp. 2-3.

[21]   See Doc. 22-6, Ex. 6 to Pl.'s 1st Am. Compl., The Extension Agreement.

[22]   See Doc. 22-4, Ex. 4 to Pl.'s 1st Am. Compl., Emails Between Parties p. 1.

paid the parties will enter into the extension."[23] Weaver responded stating "Cohen will confirm receipt today. Those funds will be used to be placed against the full reinstatement balance. Upon receipt of the remaining balance, and then completed extension, the loan would be reinstated."[24] On October 19, 2018, Plaintiff wired $100,000 to Cohen, who confirmed receipt on October 22, 2018.[25]

On October 24, 2018, Underwood sent an email to Weaver inquiring about the details of the insurance that was placed on the Properties because one property had water damage and another had a water leak.[26] Weaver informed Underwood that the insurance policy was a "force place policy" and asked for details on the issues.[27] On October 25, 2018, Underwood forwarded the information necessary for the insurance claims and informed Weaver that an additional $250,000 would be available to transfer the next day and the remaining balance would be transferred the following week.[28]

Weaver responded to Underwood on October 26, 2018, stating that it was "challenging" to hear about these insurance issues and

---

[23] See id.

[24] See id.

[25] See Doc. 22-5, Ex. 5 to Pl.'s 1st Am. Compl., Emails Confirming Wire Transfer.

[26] See Doc. 22-7, Ex. 7 to Pl.'s 1st Am. Compl., Emails Between Parties pp. 3-5.

[27] See id. p. 4.

[28] See id. p. 3.

6

indicated that there was also a $45,000 lien on the Property.[29] Weaver also stated that he would like to discuss the progress on reinstatement over the phone so he could "reiterate what the remaining balances due [were] so [they were] being 100% transparent."[30] Underwood responded that the lien had been released and requested confirmation that the remaining balance for reinstatement did not include default interest, an exit fee, or revaluation fee.[31] Underwood also requested confirmation that the remaining balance was approximately $290,000, and that after the $250,000 payment, the balance would be approximately $40,000.[32] It appears that Weaver responded by asking Underwood for a phone call to discuss.[33] Underwood later responded to Weaver's request for a phone call stating that the $290,000 was available to be transferred immediately, and, if the parties could "proceed [as] originally agreed, ie, without the additional confession of judgment on the [default interest]," Underwood would inform his clients to proceed with the transfer.[34]

On October 31, 2018, Weaver emailed Underwood stating:

---

[29] See id. p. 2.

[30] See id.

[31] See id. pp. 1-2.

[32] See id.

[33] See id. p. 1. It is unclear whether a phone call happened next or what the content of that conversation was.

[34] See id.

7

> Good speaking with you yesterday. I am reattaching the payoff letter issued by our servicer Cohen Financial that is good through the end of today. We are confirmed in receipt of $100,000 which is currently in unapplied and being held by Cohen.
>
> Based on the terms of the promissory note (section 5) executed on July 20, 2017 - the default rate of interest being charged is 26%. Th[e] amounts in the payoff letter needing to be paid in order to reinstate the loan are the regular interest, default interest, late fees, [force place] insurance premiums, and special servicing fees.
>
> As a compromise for reinstatement, we would accept a confession of judgment and waiver of defenses to reduce the contractual default rate from 26% to 18%. This is a material reduction to the contractual obligation in the note that has been defaulted on. Absent such compromise, we can accept the full amount of funds required for reinstatement as calculated per the terms of the promissory note.[35]

Plaintiff disagreed with Defendants' position and filed this lawsuit stopping the November 6, 2018 sale of the property.

**B. <u>Procedural Background</u>**

Plaintiff filed this lawsuit in Texas state court on November 2, 2018.[36] Defendants removed the lawsuit to this court on December 3, 2018.[37] On December 5, Defendants filed their first motion to dismiss Plaintiff's complaint for failure to state a claim.[38] On February 1, 2019, the court granted Plaintiff leave to file an

---

[35] See Doc. 22-8, Ex. 9 to Pl.'s 1st Am. Compl., Oct. 31, 2018 Email from Weaver to Underwood.

[36] See Doc. 1-1, Ex. A to Defs.' Not. of Removal, Pl.'s Orig. Pet.

[37] See Doc. 1, Defs.' Not. of Removal.

[38] See Doc. 5, Defs.' 1st Mot. to Dismiss.

8

amended complaint and denied Defendants' first motion to dismiss.[39] On February 6, 2019, Plaintiff filed its amended complaint.[40] On March 1, 2019, Defendants filed their pending motion to dismiss.[41] Plaintiff filed a response to the motion to dismiss on March 21, 2019.[42] Defendants filed a reply in support of their motion to dismiss on March 28, 2019.[43]

## II. Legal Standard

Rule 12(b)(6) allows dismissal of an action whenever the complaint, on its face, fails to state a claim upon which relief can be granted. When considering a motion to dismiss, the court may consider, in addition to the complaint itself, "any documents attached to the complaint[] and any documents attached to the motion to dismiss that are central to the claim and referenced by the complaint." Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC, 594 F.3d 383, 387 (5th Cir. 2010). The attached documents control in the case of a conflict between the allegations in the complaint and the contents of the documents. See United States ex rel. Riley v. St. Luke's Epis. Hosp., 355 F.3d 370, 377 (5th Cir. 2004).

---

[39] See Docs. 19 & 20, Ords. Dated Feb. 1, 2019.

[40] See Doc. 22, Pl.'s 1st Am. Compl.

[41] See Doc. 26, Defs.' Mot. to Dismiss Pl.'s Am. Compl.

[42] See Doc. 27, Pl.'s Resp. to Defs.' Mot. to Dismiss.

[43] See Doc. 28, Defs.' Reply in Support of Mot. to Dismiss.

9

The court should construe the allegations in the complaint favorably to the pleader and accept as true all well-pleaded facts. Harold H. Huggins Realty, Inc. v. FNC, Inc., 634 F.3d 787, 803 n.44 (5th Cir. 2011)(quoting True v. Robles, 571 F.3d 412, 417 (5th Cir. 2009)). A complaint need not contain "detailed factual allegations" but must include sufficient facts to indicate the plausibility of the claims asserted, raising the "right to relief above the speculative level." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007); see also Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). Plausibility means that the factual content "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. 678. A plaintiff must provide "more than labels and conclusions" or "a formulaic recitation of the elements of a cause of action." Twombly, 550 U.S. at 555. In other words, the factual allegations must allow for an inference of "more than a sheer possibility that a defendant has acted unlawfully." Iqbal, 556 U.S. 678.

### III. Analysis

Plaintiff's causes of action against Defendants are for common law fraud and breach of contract. Plaintiff also pleads that it is entitled to exemplary damages. Defendants argue that Plaintiff's lawsuit should be dismissed under Rule 12(b)(6).

**A.   Choice of Law**

The parties argue that both New York and Texas law applies to this lawsuit.

When the laws of two or more states may apply to the various claims in a federal diversity action, the court must apply the choice of law rules of the forum state. Mayo v. Hartford Life Ins. Co., 354 F.3d 400, 403 (5th Cir. 2004) (citing Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941)); see also Benchmark Elecs., Inc. v. J.M. Huber Corp., 343 F.3d 719, 726 (5th Cir.), modified on denial of rehearing on other grounds, 355 F.3d 356 (5th Cir. 2003); Caton v. Leach Corp., 896 F.2d 939, 942 (5th Cir. 1990). Thus, Texas law determines whether Texas or New York law applies to each claim in this action. Cf. Scottsdale Ins. Co. v. Nat'l Emergency Servs., Inc., 175 S.W.3d 284, 291 (Tex. App.–Houston [1st Dist.] 2004, pet. denied)("Texas law may apply to some claims, but not other claims.").

Texas law generally gives effect to contractual choice-of-law provisions. See Caton, 896 F.2d 942 (applying Texas conflicts law); Restatement (Second) of Conflict of Laws ("Restatement") § 187. If broad enough, such provisions may cover tort as well as contract claims. Cf. Caton, 896 F.2d at 943 (limiting a narrow choice-of-law provision to claims related to contract construction). In the absence of an applicable choice of law provision, this court applies Texas law unless a conflict exists between Texas law and that of the other proposed state. Mumblow v.

Monroe Broad., Inc., 401 F.3d 616, 620 (5th Cir. 2005); see also Kimberly-Clark Corp. v. Factory Mut. Ins. Co., 566 F.3d 541, 546 n.6 (5th Cir. 2009); Schneider Nat'l Transp. v. Ford Motor Co., 280 F.3d 532, 536 (5th Cir. 2002).

If a conflict exists, Texas directs courts to employ the "most significant relationship" test as stated in the Restatement. Gutierrez v. Collins, 583 S.W.2d 312, 318 (Tex. 1979)(adopting the methodology of the Restatement for application in determining choice of law for tort claims); see also Mayo, 354 F.3d at 403 (stating that Texas courts use the "most significant relationship" test for all cases in the absence of an applicable contractual choice-of-law provision); Restatement § 6 (listing factors to consider in resolving a conflict of laws in the absence of a statutory directive). The court evaluates the contacts "for their quality, not their quantity." Mayo, 354 F.3d at 405.

The Note and the Deed of Trust contain choice-of-law provisions specifying that they are governed by New York law.[44] The parties appear to be in agreement that New York law applies to Plaintiff's breach of contract claim and that Texas law applies to Plaintiff's fraud claim. The court will follow the parties' lead on choice of law, but does not make an express finding on this issue.

---

[44] See Doc. 22-1, Ex. 1 to Pl.'s 1st Am. Compl., The Note p. 4; Doc. 26-1, Ex. 2 to Defs.' Mot. to Dismiss, Assignment of the Deed of Trust p. 16.

**B.  Breach of Contract**

Defendants argue that the essential terms of a complete agreement are lacking and that Plaintiff's payment did not constitute partial performance under the alleged agreement because it was not "unequivocally referable to the alleged agreement."[45]

Under New York law, the elements of a breach of contract claim are: "the existence of a contract, the plaintiff's performance under the contract, the . . . defendants' breach of their obligations under the contract, and damages resulting from that breach." Hausen v. N. Fork Radiology, P.C., 171 A.D.3d 888, 892 (N.Y. App. Div. 2019)(citing De Guaman v. Am. Hope Group, 163 A.D.3d 915, 917 (N.Y. App. Div. 2018)).

The alleged loan modification is subject to New York's statute of frauds. See N.Y. Gen. Oblig. Law § 5-703. "To satisfy the statute of frauds, a memorandum, subscribed by the party to be charged, must designate the parties, identify and describe the subject matter, and state all of the essential terms of a complete agreement." Dahan v. Weiss, 120 A.D.3d 540, 541 (2014)(citing TR-One, Inc. v. Lazz Dev. Co., Inc., 95 A.D.3d 1303 (2012)). In New York, emails with the party's name signed at the bottom are sufficient to constitute a writing for the purposes of the statute of frauds. See e.g., Solartech Renewables, LLC v. Vitti, 156 A.D.3d 995, 999 (N.Y. App. Div. 2017). The statute of frauds does

---

[45] See Doc. 26, Defs.' Mot. to Dismiss pp. 6-8.

not "abridge[] the powers of courts of equity to compel the specific performance of agreements in cases of part performance." See N.Y. Gen. Oblig. Law § 5-703(4).

In the emails between the parties the following relevant terms were discussed: (1) reinstatement of the loan and an extension of the loan's maturity date; (2) the price to be paid by Plaintiff for reinstatement and extension of the loan; (3) the extended maturity date of the loan; (4) which fees were being charged and which fees were being waived; and (5) other terms. While it is clear that the parties are not in agreement on the specifics of various terms, the allegations and evidence currently before the court are sufficient, at this stage, to support the allegation that an agreement was formed in compliance with the statute of frauds.

Furthermore, even if the court prematurely found that the alleged agreement did not comport with the statute of frauds, the $100,000 payment by Plaintiff constitutes partial performance of the alleged agreement, which can excuse it from application of the statute of frauds. To avoid the statute of frauds, the partial performance "must be unequivocally referable to the modification." Calica v. Reisman, Peirez & Reisman, LLP, 296 A.D.2d 367, 369 (2002). Defendants argue that Plaintiff's payment is not unequivocally referable to the alleged modification because it could have been: (1) a payment on the loan itself; (2) a payment towards the full reinstatement amount, as Defendants allegedly told

14

Plaintiff it was; or (3) made for some other reason.[46] The communications between the parties heavily suggest that this payment was made pursuant to the alleged modification agreement. Regardless, at this stage, absent unequivocal evidence to the contrary, which is not present, Plaintiff need only state that the payment was made pursuant to the alleged modification agreement. Plaintiff has so stated.[47]

For these reasons, Defendants' motion is **DENIED** as to Plaintiff's breach of contract claim.

**C. Fraud**

Defendants argue that Plaintiff's fraud claim was not pled with particularity and is barred by the economic loss rule and statute of frauds.

"To prevail on a fraud claim, a plaintiff must show: (1) the defendant 'made a material representation that was false'; (2) the defendant 'knew the representation was false or made it recklessly as a positive assertion without any knowledge of its truth;' (3) the defendant intended to induce the plaintiff to act upon the representation; and (4) the plaintiff actually and justifiably relied upon the representation and suffered injury as a result." JPMorgan Chase Bank, N.A. v. Orca Assets G.P., L.L.C., 546 S.W.3d 648, 653 (Tex. 2018)(quoting Ernst & Young, L.L.P. v. Pac. Mut.

---

[46] See id. p. 9.

[47] See Doc. 22, Pl.'s 1st Am. Compl. p. 3.

15

Life Ins. Co., 51 S.W.3d 573, 577 (Tex. 2001)).

   1. **Particularity**

"In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). To plead a fraud claim with particularity the plaintiff generally must plead: (1) "the time, place and contents of the false representation[;]" (2) "the identity of the person making the misrepresentation[;] and (3) what was obtained by the misrepresentation. See U.S. ex rel. Grubbs v. Kanneganti, 565 F.3d 180, 186 (5th Cir. 2009)(citing U.S. ex rel. Russell v. Epic Healthcare Mgmt. Group, 193 F.3d 304, 308 (5th Cir. 1999), abrogated on other grounds by U.S. ex rel. Eisenstein v. City of New York, New York, 556 U.S. 928 (2009)).

Here, Plaintiff has pled that, via email, Weaver falsely represented that payment of $389,866.77 would reinstate the loan and that various fees would be waived as a part of the reinstatement agreement.[48] As a result, Plaintiff paid Defendants $100,000 and was later put into the difficult position of either meeting Defendants' additional demands, which were made at the end of October 2018, or allowing the trust sale of the property to proceed on November 6, 2018.[49] Plaintiff has sufficiently pled its fraud claim. Further, the evidence attached to Plaintiff's

---

[48] See Doc. 22 Pl.'s 1st Am. Compl. p. 5.

[49] See id.

complaint that Defendants argue disproves Plaintiff's claim, is sufficient to state a claim for relief.

### 2. Statute of Frauds

Defendants argue that if a promise is found to be unenforceable under the statue of frauds then a cause of action for fraud based on that promise cannot proceed. As discussed above, Plaintiff has shown evidence of partial performance that may excuse the alleged agreement from application of the statute of frauds. Accordingly, this argument fails at this stage.

### 3. Economic Loss Rule

Defendants argue that the economic loss rule bars Plaintiff's fraud claim.

The economic loss rule precludes recovery in tort for economic losses resulting from the failure of a party to perform under a contract. Lamar Homes, Inc. v. Mid-Continent Cas. Co., 242 S.W.3d 1, 12 (Tex. 2007)(citing Sw. Bell Tel. Co. v. DeLanney, 809 S.W.2d 493, 494-95 (Tex. 1991)). The focus of the inquiry is to determine whether the injury is to the subject of the contract itself. Id. at 13. In making this inquiry, the court must consider (1) whether the claim arises from the breach of a duty created by the contract or a duty imposed by law and (2) whether the injury is only the economic loss to the subject of the contract itself. See Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc., 960 S.W.2d 41, 45-47 (Tex. 1998). The burden is on the plaintiff to

establish an independent injury.  Sterling Chems., Inc. v. Texaco Inc., 259 S.W.3d 793, 796 (Tex. App.—Houston [1st Dist.] 2007, pet. denied).

"The economic loss rule does not apply to fraud claims . . . ."  Experian Info. Sols., Inc. v. Lexington Allen L.P., 4:10-CV-144, 2011 WL 1627115, at *12 (E.D. Tex. Apr. 7, 2011)(citing Kajima Intern., Inc. v. Formosa Plastics Corp., USA, 15 S.W.3d 289, 294 (Tex. App.—Corpus Christi 2000, pet. denied); see also Hurd v. BAC Home Loans Servicing, LP, 880 F. Supp. 2d 747, 764 (N.D. Tex. 2012)(citing case law holding that fraud and fraudulent inducement claims are not barred by the economic loss rule).  Furthermore, to the extent there is not actually a contract between the parties, as Defendant contends, the economic loss rule would be inapplicable.  For these reasons, this argument also fails.

## IV. Conclusion

Based on the foregoing, the court **DENIES** Defendants' Motion to Dismiss.

**SIGNED** in Houston, Texas, this 9th day of October, 2019.

18